Cristina Perez Hesano (#027023)
**PEREZ LAW GROUP, PLLC**
7508 N. 59th Avenue
Glendale, Arizona 85301
Phone: (602) 730-7100
Fax: (602) 794-6956
cperez@perezlawgroup.com

Gary M. Klinger (#6303726)*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
gklinger@milberg.com

*Counsel for Plaintiff and
the Proposed Class*

***Pro Hac Vice Forthcoming**

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Shannon Cobb, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> OnePoint Patient Care, <br><br> Defendant. | Case No.: _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR A JURY TRIAL** |

Plaintiff Shannon Cobb ("Plaintiff") brings this Class Action Complaint ("Complaint") against OnePoint Patient Care ("OnePoint" or "Defendant") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her

own actions and her counsels' investigation, and upon information and belief as to all other matters, as follows:

**SUMMARY OF ACTION**

1.    Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard sensitive information of its clients' patients.

2.    Defendant is a hospice-dedicated pharmacy that provides healthcare and pharmaceutical services to its clients.

3.    Plaintiff's and Class Members' sensitive personal information—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was targeted, compromised and unlawfully accessed due to the Data Breach.

4.    OnePoint collected and maintained certain personally identifiable information and protected health information of Plaintiff and the putative Class Members (defined below), who are (or were) patients at Defendant's clients.

5.    The Private Information compromised in the Data Breach included Plaintiff's and Class Members' full names, addresses, residence information, and Social Security numbers, ("personally identifiable information" or "PII") and medical information, which is protected health information ("PHI", and collectively with PII, "Private Information") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

6.    The Private Information compromised in the Data Breach was exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who target Private Information for its value to identity thieves.

7. As a result of the Data Breach, Plaintiff and approximately 795,000 Class Members[1] suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of their Private Information consisting of an increase in spam calls, texts, and/or emails; (viii) Plaintiff's Private Information being disseminated on the dark web, according to Experian; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

8. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect its clients' patients' Private Information from a foreseeable and preventable cyber-attack.

9. Moreover, upon information and belief, Defendant was targeted for a cyber-attack due to its status as a healthcare entity that collects and maintains highly valuable Private Information on its systems.

---

[1] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf

10.     Defendant maintained, used, and shared the Private Information in a reckless manner. In particular, the Private Information was used and transmitted by Defendant in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

11.     Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

12.     Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct because the Private Information that Defendant collected and maintained has been accessed and acquired by data thieves.

13.     Armed with the Private Information accessed in the Data Breach, data thieves have already engaged in identity theft and fraud and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

14.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

15.     Plaintiff and Class Members may also incur out of pocket costs, *e.g.*, for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

16.     Plaintiff brings this class action lawsuit on behalf all those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

17.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

18.     Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000

exclusive of interest and costs, and members of the proposed Class, including Plaintiff, are citizens of states different from Defendant.

20.    This Court has jurisdiction over Defendant through its business operations in this District, the specific nature of which occurs in this District. Defendant's principal place of business is in this District. Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## **PARTIES**

22.    Plaintiff Shannon Cobb is a resident and citizen of McHenry, Illinois.

23.    Defendant OnePoint Patient Care is a company with its principal place of business located in Tempe, Arizona.

## **FACTUAL ALLEGATIONS**

### ***Defendant's Business***

24.    Defendant is a hospice-dedicated pharmacy that provides healthcare and pharmaceutical services to its clients.

25.    Plaintiff and Class Members are current and former patients at Defendant's clients.

26.    In the course of their relationship, patients at Defendant's clients, including Plaintiff and Class Members, provided Defendant with at least the following: names, addresses, Social Security numbers, and other sensitive information.

27.     Upon information and belief, in the course of collecting Private Information from patients, including Plaintiff, Defendant promised to provide confidentiality and adequate security for the data it collected from patients through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

28.     Indeed, Defendant provides on its website that: "[w]e are required by law to: [] [m]aintain the privacy and security of your medical information[.][2]

29.     Plaintiff and the Class Members, as patients at Defendant's clients, relied on these promises and on this sophisticated business entity to keep their sensitive Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Patients, in general, demand security to safeguard their Private Information, especially when their Social Security numbers and other sensitive Private Information is involved.

### *The Data Breach*

30.     On or about October 23, 2024, Defendant began sending Plaintiff and other Data Breach victims a Notice of Data Breach letter (the "Notice Letter"), informing them that:

**What Happened?** On August 8, 2024, we detected suspicious activity on our computer network. Upon identifying the issue, we promptly initiated an internal investigation, took steps to contain the incident, and engaged a forensic security firm to further investigate. On August 15, 2024, we learned that an unauthorized third party acquired some information from our network between August 6 and August 8, 2024.

**What Information Was Involved?** We have been reviewing the files at issue and recently determined that they contain some patients' personal information, including your name, address, residence information, medical record number, diagnosis, Social

---

[2] https://www.oppc.com/privacy-policy/

Security number and prescription information.[3]

31.    Omitted from the Notice Letter were the identity of the cybercriminals who perpetrated this Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

32.    This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

33.    Despite Defendant's intentional opacity about the root cause of this incident, several facts may be gleaned from the Notice Letter, including: a) that this Data Breach was the work of cybercriminals; b) that the cybercriminals first infiltrated Defendant's networks and systems, and downloaded data from the networks and systems (aka exfiltrated data, or in layperson's terms "stole" data; and c) that once inside Defendant's networks and systems, the cybercriminals targeted information including Class Members' Social Security numbers, PHI, and other sensitive information for download and theft.

34.    Moreover, in its Notice Letter, Defendant failed to specify whether it undertook any efforts to contact the Class Members whose data was accessed and acquired in the Data

---

[3]    The "Notice Letter". A sample copy is available at https://oag.ca.gov/system/files/OPPC%20Adult%201yr%20CM.pdf

Class Action Complaint            - Page 8 -

Breach to inquire whether any of the Class Members suffered misuse of their data or whether Defendant was interested in hearing about misuse of their data or set up a mechanism for Class Members to report misuse of their data.

35.    Defendant had obligations created by the FTC Act, HIPAA, contract, common law, and industry standards to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

36.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

37.    The attacker accessed and acquired files containing unencrypted Private Information of Plaintiff and Class Members. Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Breach.

38.    Plaintiff has been informed by Experian that her Private Information has been disseminated on the dark web, and Plaintiff further believes that the Private Information of Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

### *Data Breaches Are Preventable*

39.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

40.     Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

41.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[4]

42.     To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

---

[4] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

Class Action Complaint          - Page 10 -

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[5]

43.    To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-Facing Assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

---

[5] *Id.* at 3-4.

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong,
       randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[6]

44.    Given that Defendant was storing the Private Information of its current and former patients, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

45.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data

---

[6] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

Breach and data thieves acquiring and accessing the Private Information of more than seven hundred thousand individuals, including that of Plaintiff and Class Members.

***Defendant Acquires, Collects, And Stores Its Clients' Patients' Private Information***

46. Defendant acquires, collects, and stores a massive amount of Private Information on its clients' current and former patients.

47. As a condition of becoming a patient at Defendant's clients, Defendant requires that its clients' patients and other personnel entrust it with highly sensitive personal information.

48. By obtaining, collecting, and using Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

49. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendant absent a promise to safeguard that information.

50. Upon information and belief, in the course of collecting Private Information from patients, including Plaintiff, Defendant promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

51. Plaintiff and the Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***Defendant Knew, Or Should Have Known, of the Risk Because Healthcare Entities In Possession Of Private Information Are Particularly Susceptible To Cyber Attacks***

52.    Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities that collect and store Private Information, like Defendant, preceding the date of the breach.

53.    Data breaches, including those perpetrated against healthcare entities that store Private Information in their systems, have become widespread.

54.    In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.  Of the 3,205 recorded data compromises, 809 of them, or 25.2% were in the medical or healthcare industry.  The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points.  The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

55.    In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including HCA Healthcare (11 million patients, July 2023), Managed Care of North America (8 million patients, March 2023), PharMerica Corporation (5 million patients, March 2023), HealthEC LLC (4 million patients, July 2023), ESO Solutions, Inc. (2.7 million patients, September 2023), Prospect Medical Holdings, Inc. (1.3 million patients, July-August 2023),  Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

56.     Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[7]

57.     Additionally, as companies became more dependent on computer systems to run their business,[8] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[9]

58.     Defendant knew and understood unprotected or exposed Private Information in the custody of insurance companies, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

59.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was

---

[7]     https://www.law360.com/patientprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=patientprotection
[8]https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html
[9]     https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

60. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

61. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

62. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen—particularly Social Security numbers and PHI—fraudulent use of that information and damage to victims may continue for years.

63. As a healthcare entity in custody of the Private Information of its clients' patients, Defendant knew, or should have known, the importance of safeguarding Private Information entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

**_Value Of Private Information_**

64. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without

authority."[10] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[11]

65.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[12]

66.     For example, Personal Information can be sold at a price ranging from $40 to $200.[13] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[14]

67.     Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life.  The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from

---

[10] 17 C.F.R. § 248.201 (2013).

[11] *Id.*

[12] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at:* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[13] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at:* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[14] *In the Dark*, VPNOverview, 2019, *available at:* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

68.    It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised for some Class Members in the Data Breach, are among the worst kind of Private Information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

69.    According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [15] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[16]

70.    The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit

---

[15] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.

[16] *Id.*

Class Action Complaint          - Page 18 -

cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[17]

71.     In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[18] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[19]

72.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

73.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[20]

---

[17] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

[18] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/

[19] *See* https://www.investopedia.com/terms/s/ssn.asp

[20] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

74.    For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols*., No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiffs' Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target her in fraudulent schemes and identity theft attacks.")

75.    Similarly, the California state government warns patients that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[21]

---

[21] *See* https://oag.ca.gov/idtheft/facts/your-ssn

76.     Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[22]

77.     The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (*e.g.,* patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, PHI/PII is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the pharmaceutical industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

78.     Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[23] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[24] In short, these sorts of data breaches

---

[22] *Medical I.D. Theft*, EFraudPrevention
https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20affected. (last visited Nov. 6, 2023).

[23] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/ (last accessed July 24, 2023).

[24] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last accessed July 24, 2023).

are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[25]

79.    According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[26]

80.    "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[27]

81.    A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[28] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[29]

---

[25] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches/ (last accessed July 24, 2023).

[26] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last accessed July 20, 2021)

[27] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last accessed July 24, 2023).

[28] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed July 24, 2023).

[29] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After*

82.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[30]

83.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers, PHI, and names.

84.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

85.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

---

*One,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-toknow-about-them-and-what-to-do-after-one/ (last accessed July 24, 2023).
[30] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*:
https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[31]

86.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

### Defendant Fails To Comply With FTC Guidelines

87.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

88.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[32]

89.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity

---

[31] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf

[32] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[33]

90.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

91.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential patient data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

92.     These FTC enforcement actions include actions against healthcare providers like Defendant. *See, e.g., In the Matter of LabMd, Inc., A Corp*, 2016-2 Trade Cas. (Henry Ford) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

93.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or

---

[33] *Id.*

practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

94.    Defendant failed to properly implement basic data security practices.

95.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to the Private Information of its clients' patients or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

96.    Upon information and belief, OnePoint was at all times fully aware of its obligation to protect the Private Information of its clients' patients, OnePoint was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

### Defendant Fails To Comply With HIPAA Guidelines

97.    Defendant is a business associate under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

98.    Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act

("HITECH").[34] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

99.    HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

100.    HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

101.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

102.    "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

103.    HIPAA's Security Rule requires Defendant to do the following:

    a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

    b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

    c.    Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

---

[34] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

d.      Ensure compliance by its workforce.

104.    HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

105.    HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

106.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***."[35]

107.    HIPAA requires a business associate to have and apply appropriate sanctions against patients of its workforce who fail to comply with the privacy policies and procedures

---

[35] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).

of the business associate or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

108. HIPAA requires a business associate to mitigate, to the extent practicable, any harmful effect that is known to the business associate of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

109. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e- and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[36] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-." US Department of Health & Human Services, Guidance on Risk Analysis.[37]

### *Defendant Fails To Comply With Industry Standards*

110. As noted above, experts studying cyber security routinely identify healthcare

---

[36] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.
[37] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html

entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

111.    Several best practices have been identified that, at a minimum, should be implemented by healthcare entities in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. OnePoint failed to follow these industry best practices, including a failure to implement multi-factor authentication.

112.    Other best cybersecurity practices that are standard for healthcare entities include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. OnePoint failed to follow these cybersecurity best practices, including failure to train staff.

113.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security

Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

114.    These foregoing frameworks are existing and applicable industry standards for healthcare entities, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### Common Injuries & Damages

115.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

### Data Breaches Increase Victims' Risk Of Identity Theft

116.    As Plaintiff has already experienced, the unencrypted Private Information of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

117.    Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

118.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

119.    Plaintiff's and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

120.    Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the

administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[38]

121.    Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective patients."[39]

122.    "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a patient's identity after the initial account setup[.]"[40] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account"[41]

123.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[42]

---

[38] *See* N.C. Gen. Stat. § 132-1.10(1).
[39] *See* https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers
[40] *See* https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/
[41] *See* https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/
[42] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank

124.   With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

125.   The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

126.   The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like contact information) of Plaintiff and the other Class Members.

127.   Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

---

transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/

128.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

***Loss Of Time To Mitigate Risk Of Identity Theft & Fraud***

129.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

130.    Thus, due to the actual and imminent risk of identity theft, Defendant, in its Notice Letter instructs Plaintiff and Class Members to take the following measures to protect themselves: "remain vigilant to protect against potential fraud and/or identity theft by, among other things, reviewing your account statements and monitoring credit reports closely."[43]

131.    In addition, Defendant's Notice letter recommends Plaintiff and Class Members to partake in activities such as monitoring their accounts, placing fraud alerts on their accounts, placing security freezes on their accounts, and contacting government agencies.[44]

132.    Defendant's extensive suggestion of steps that Plaintiff and Class Members must take in order to protect themselves from identity theft and/or fraud demonstrates the significant time that Plaintiffs and Class Members must undertake in response to the Data

---

[43] Notice Letter.
[44] *Id.*

Breach. Plaintiff's and Class Members' time is highly valuable and irreplaceable, and accordingly, Plaintiff and Class Members suffered actual injury and damages in the form of lost time that they spent on mitigation activities in response to the Data Breach and at the direction of Defendant's Notice Letter.

133.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

134.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[45]

135.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[46]

---

[45] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[46] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

136.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

### Diminution of Value of Private Information

137.    PII and PHI are valuable property rights.[47] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

138.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[48]

139.    An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[49]

---

[47] See "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[48] See, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[49] See Ashiq Ja, Hackers Selling Healthcare Data in the Black Market, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

140.   In fact, the data marketplace is so sophisticated that patients can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[50,51]

141.   Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[52]

142.   Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[53]

143.   As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

144.   At all relevant times, OnePoint knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was

---

[50] https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[51] https://datacoup.com/
[52] https://digi.me/what-is-digime/
[53] *Medical I.D. Theft*, EFraudPrevention
https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20affected. (last visited Nov. 6, 2023).

Class Action Complaint          - Page 38 -

breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

145.    The fraudulent activity resulting from the Data Breach may not come to light for years.

146.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

147.    OnePoint was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to more than seven hundred thousand individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

148.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

***Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary***

149.    Given the type of targeted attack in this case, sophisticated criminal activity, the type of Private Information involved, and Plaintiff's Private Information already being disseminated on the dark web, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes –

*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

150.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

151.    Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

152.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

### Loss Of Benefit Of The Bargain

153.    Furthermore, Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant's clients for medical services, Plaintiff and other reasonable patients understood and expected that they were, in part, paying for the services and necessary data security to protect the Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant's clients.

### Plaintiff Shannon Cobb's Experience

154. Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations.

155. At the time of the Data Breach—August 6, 2024 through August 8, 2024—Defendant maintained Plaintiff's Private Information in its system.

156. Plaintiff Cobb is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendant had she known of Defendant's lax data security policies.

157. Plaintiff Shannon Cobb received the Notice Letter, by mail, directly from Defendant, dated October 23, 2024. According to the Notice Letter, Plaintiff's Private Information was improperly accessed and obtained by unauthorized third parties, including her name, address, residence information, medical record number, diagnosis and prescription information.

158. As a result of the Data Breach, and at the direction of Defendant's Notice Letter, which instructs Plaintiff to "remain vigilant to protect against potential fraud and/or identity theft by, among other things, reviewing your account statements and monitoring credit reports closely[,]"[54] Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have

---

[54] Notice Letter.

spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

159.    Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (ix) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

160.    Plaintiff additionally suffered actual injury in the form of her Private Information being disseminated on the dark web, according to Experian, which, upon information and belief, was caused by the Data Breach.

161.    Plaintiff additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of her Private Information was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and

associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

162.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

163.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

164.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

165.    Plaintiff Shannon Cobb has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

166.    Pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5), Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

**Nationwide Class**
All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendant in October 2024 (the "Class").

**Illinois Subclass**
All individuals residing in the State of Illinois whose Private Information was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendant in October 2024 (the "Illinois Subclass").

167.    Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

168.    Plaintiff reserves the right to amend the definitions of the Classes or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

169.    <u>Numerosity</u>: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. According to the breach report submitted to the U.S. Department of Health and Human Services, approximately 795,000 persons were impacted in the Data Breach.[55] The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

170.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the

---

[55] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf

questions of law and fact common to the Class that predominate over questions which may affect individual Class Members, including the following:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendant had respective duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant had respective duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d. Whether Defendant failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e. Whether and when Defendant actually learned of the Data Breach;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiff and Class Members are entitled to actual damages and/or nominal damages as a result of Defendant's wrongful conduct;

k.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

171.  <u>Typicality:</u> Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

172.  <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

173.  <u>Adequacy:</u> Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages she has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intend to prosecute this action vigorously.

174.  <u>Superiority and Manageability:</u> The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all

Class Action Complaint          - Page 46 -

other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

175.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

176.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

177. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

178. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

179. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

180. Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a. Whether Defendant failed to timely notify the Plaintiff and the class of the Data Breach;

    b. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    c. Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

    d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.  Whether Defendant failed to take commercially reasonable steps to safeguard Class Members' Private Information; and

f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I
**Negligence**
**(On Behalf of Plaintiff and the Class)**

181.    Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

182.    Defendant requires its clients' patients, including Plaintiff and Class Members, to submit non-public Private Information in the ordinary course of providing its services.

183.    Defendant gathered and stored the Private Information of Plaintiff and Class Members as part of its business of soliciting its services to its clients, which solicitations and services affect commerce.

184.    Plaintiff and Class Members entrusted Defendant with their Private Information with the understanding that Defendant would safeguard their information.

185.    Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

186.    By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had

a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

187.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

188.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

189.    For instance, HIPAA required Defendant to notify victims of the Breach within 60 days of the discovery of the Data Breach. Defendant did not begin to notify Plaintiff or Class Members of the Data Breach until October 23, 2024 despite, upon information and belief, Defendant knowing shortly after August 8, 2024 that unauthorized persons had accessed and acquired the private, protected, personal information of Plaintiff and the Class.

190.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the Private Information.

191.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between OnePoint and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted OnePoint with their confidential Private Information, a necessary part of being patients at Defendant's clients.

192.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

193.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

194.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former patients' Private Information it was no longer required to retain pursuant to regulations.

195.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

196.    Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take

steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

197.    Defendant breached its duties, pursuant to the FTC Act, HIPAA, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

    b.  Failing to adequately monitor the security of their networks and systems;

    c.  Allowing unauthorized access to Class Members' Private Information;

    d.  Failing to detect in a timely manner that Class Members' Private Information had been compromised;

    e.  Failing to remove former patients' Private Information it was no longer required to retain pursuant to regulations, and

    f.  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

198.    Defendant violated Section 5 of the FTC Act and HIPAA by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and

the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

199.    Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act and HIPAA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statutes were intended to guard against.

200.    Defendant's violation of Section 5 of the FTC Act and HIPAA constitutes negligence.

201.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

202.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

203.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

204.    Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

205.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the

inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems or transmitted through third party systems.

206.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

207.    Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

208.    Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

209.    Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

210.    Defendant has admitted that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

211.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

212.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

213.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of their Private Information consisting of an increase in spam calls, texts, and/or emails; (viii) Plaintiff's Private Information being disseminated on the dark web, according to Experian; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

214.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further

unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

215.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

216.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

### COUNT II
**Negligence *Per Se***
**(On Behalf of Plaintiff and the Class)**

217.    Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

218.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies, such as Defendant, of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendant's duty.

219.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l).

Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

220.    For instance, HIPAA required Defendant to notify victims of the Breach within 60 days of the discovery of the Data Breach. Defendant did not begin to notify Plaintiff or Class Members of the Data Breach until October 23, 2024 despite, upon information and belief, Defendant knowing shortly after August 8, 2024 that unauthorized persons had accessed and acquired the private, protected, personal information of Plaintiff and the Class.

221.    Defendant violated Section 5 of the FTC Act and HIPAA by failing to use reasonable measures to protect Private Information and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

222.    Defendant's violation of Section 5 of the FTC Act and HIPAA constitutes negligence *per se*.

223.    Class Members are consumers within the class of persons that Section 5 of the FTC Act and HIPAA were intended to protect.

224.    Moreover, the harm that has occurred is the type of harm that the FTC Act and HIPAA intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

225.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

226.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

227.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer injury, including but not limited to:

228.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

229.    Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

230.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

231.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

232.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT III**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

233.    Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

234.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their Private Information. In exchange, Plaintiff and Class Members should have had their Private Information protected with adequate data security.

235.    Defendant knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiff's retained data and used Plaintiff's and Class Members' Private Information for business purposes.

236.    Defendant failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

237.    Defendant acquired the Private Information through inequitable record retention as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

238.    If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would have entrusted their Private Information at Defendant or obtained medical services at Defendant's clients.

239.    Plaintiff and Class Members have no adequate remedy at law.

240.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

241.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

242.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the

actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of their Private Information consisting of an increase in spam calls, texts, and/or emails; (viii) Plaintiff's Private Information being disseminated on the dark web, according to Experian; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

243.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

244.    Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT IV
**Violation Of The Illinois Consumer Fraud Act**
**815 Ill. Comp. Stat. §§ 505/1, *et seq.***
**(On Behalf of Plaintiff and the Illinois Subclass)**

245.    Plaintiff restates and realleges all proceeding allegations above and hereafter as if fully set forth herein, and brings this claim on behalf of herself and the Illinois Subclass

(the "Class" for the purposes of this count).

246.    Plaintiff and the Class are "consumers" as that term is defined in 815 ILL. COMP. STAT. § 505/1(e).

247.    Plaintiff, the Class, and Defendant are "persons" as that term is defined in 815 ILL. COMP. STAT. § 505/1(c).

248.    Defendant is engaged in "trade" or "commerce," including the provision of services, as those terms are defined under 815 ILL. COMP. STAT. § 505/1(f).

249.    Defendant engages in the "sale" of "merchandise" (including services) as defined by 815 ILL. COMP. STAT. § 505/1(b) and (d).

250.    Defendant's acts, practices, and omissions were done in the course of Defendant's business of marketing, offering for sale, and selling pharmaceutical services in the State of Illinois.

251.    Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of "merchandise" (as defined in the Illinois CFA) in violation of the Illinois CFA, including, but not limited to, the following:

  a.  failure to maintain adequate computer systems and data security practices to safeguard current and former patients' PII;

  b.  failure to disclose the material fact that its computer systems and data security practices were inadequate to safeguard the personal information it was collecting and maintaining from theft;

c.  failure to disclose in a timely and accurate manner to Plaintiff and the Class Members the material fact of Defendant's data breach;

d.  misrepresenting material facts to Plaintiff and the Class, in connection with the sale of goods and services, by representing that it would maintain adequate data privacy and security practices and procedures to safeguard Plaintiff's and Class members' Private Information from unauthorized disclosure, release, data breaches, and theft;

e.  misrepresenting material facts to the class, in connection with the sale of goods and services, by representing that Defendant did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Plaintiff's and Class members' Private Information, and

f.  failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiff's and Class members' Private Information from further unauthorized disclosure, release, data breaches, and theft.

252.  In addition, Defendant's failure to disclose that its computer systems were not well protected and that Plaintiff's and Class members' sensitive information was vulnerable and susceptible to intrusion and cyberattacks constitutes deceptive and/or unfair acts or practices because Defendant knew such facts would (a) be unknown to and not easily discoverable by Plaintiff and the Class; and (b) defeat Plaintiff's and Class members' ordinary, foreseeable and reasonable expectations concerning the security of their Private Information on Defendant's servers.

253.    Defendant intended that Plaintiff and the Class rely on its deceptive and unfair acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts, in connection with Defendant's offering of goods and services and storing Plaintiff's and Class members' Private Information on its servers, in violation of the Illinois CFA.

254.    Defendant also engaged in unfair acts and practices by failing to maintain the privacy and security of class members' personal information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the data breach.

255.    These unfair acts and practices violated duties imposed by laws including Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA, and similar state laws.

256.    Defendant's wrongful practices occurred in the course of trade or commerce.

257.    Defendant's wrongful practices were and are injurious to the public interest because those practices were part of a generalized course of conduct on the part of Defendant that applied to all Class members and were repeated continuously before and after Defendant obtained Private Information from Plaintiff and Class members.

258.    All Class members have been adversely affected by Defendant conduct and the public was and is at risk as a result thereof.

259.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered harm, including, but not limited to:  (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost

time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of their Private Information consisting of an increase in spam calls, texts, and/or emails; (viii) Plaintiff's Private Information being disseminated on the dark web, according to Experian; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

260.    Pursuant to 815 ILL. COMP. STAT. § 505/10a(a), Plaintiff seeks actual, compensatory, and punitive damages (pursuant to 815 ILL. COMP. STAT. § 505/10a(c)), injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the Illinois CFA.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grants the following:

A.    For an Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

   i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

   ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

   iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

   iv.    requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information for Plaintiff's and Class Members' respective lifetimes;

   v.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

   vi.    prohibiting Defendant from maintaining the Private Information of Plaintiff and Class Members on a cloud-based database;

vii.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii.   requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x.    requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

xi.    requiring Defendant to conduct regular database scanning and securing checks;

xii.   requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.   requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.   requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect herself;

xvii.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xviii.   for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to

evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: December 3, 2024.          Respectfully Submitted,

By: */s/ Cristina Perez Hesano*
Cristina Perez Hesano
**PEREZ LAW GROUP, PLLC**
7508 N. 59th Avenue
Glendale, AZ  85301
Phone (602) 730-7100
cperez@perezlawgroup.com

Gary M. Klinger (*Pro Hac Vice forthcoming*)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
gklinger@milberg.com

*Attorneys for Plaintiff and the Proposed Class*